Filed 1/5/22  P. v. Carvajal CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B310884 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA368069) |
| v. | |
| FRANCISCO CARVAJAL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Reversed and remanded.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Daniel C. Chang and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Francisco Carvajal (defendant) appeals from the order denying his petition for resentencing pursuant to Penal Code section 1170.95.[1]  He contends that the trial court erred in finding that he had not made a prima facie showing of eligibility for relief under that statute.  Both the People and we agree.  The order is reversed, and the matter is remanded to the superior court with directions to issue an order to show cause and conduct an evidentiary hearing pursuant to section 1170.95, subdivision (d).

## BACKGROUND

In 2011 defendant was charged with the murder of Juan Ocegueda and the allegations that the crime was committed in association with a criminal street gang and that defendant personally used a deadly weapon, a knife, in the commission of the crime.  Defendant was tried by a jury, which was instructed that defendant was being prosecuted under two theories:  "(1) malice aforethought, and (2) felony murder" based on burglary and attempted robbery.  The court instructed with CALCRIM Nos. 520, 521, 540A, 540B and 548.  The jury found defendant guilty of first degree murder with a true gang finding, but found not true the allegation that he had personally used a knife.  Defendant was sentenced to 25 years to life in prison, plus 10 years due to the gang finding.  Upon defendant's appeal we amended the sentence to life in prison with a 15-year minimum parole eligibility term pursuant to section 186.22, subdivision (b)(5).  The judgment was otherwise affirmed in *People v.*

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

2

*Carvajal* (Sept. 19, 2013, B239135) (nonpub. opn.) (appellate opinion).[2]

The evidence at defendant's 2011 trial showed that the victim Ocegueda and his brother Julio lived in rooms in their parents' garage near a back alley. Their sister Elizabeth and their parents occupied the main house in front. Shortly before 8:45 a.m. on December 6, 2006, Elizabeth saw Ocegueda on the front porch with a man she knew as "Chance," identified by other witnesses as David Canche. Elizabeth saw Canche walk toward the back gate that led to the alley where he spoke to another man who appeared to be hiding behind the garage. Elizabeth could barely see the other man and could not identify him. Elizabeth and her mother then left in their car to bring Julio home from the hospital. A short while later Ocegueda knocked on his neighbor's door for help and then collapsed. When Elizabeth, Julio and their mother returned home, the police were there.

Ocegueda suffered four stab wounds. One was five to six inches deep and penetrated his chest, right lung, and right heart ventricle, causing death within several minutes. The medical examiner testified that the fatal wound was probably caused by a knife.

Canche's girlfriend Monique Flores testified that in December 2006, Ocegueda was a close friend, like a brother to her. Ocegueda occasionally allowed Flores and Canche to stay with him in his room, and the three sometimes used drugs together. Canche and defendant were members of the Highland Park gang, and Flores admitted to associating with the gang.

---

[2] Our summary of the procedural facts and trial evidence is taken from the appellate opinion.

She also admitted to having committed several felonies including a robbery with Canche. While she drove a car she and Canche had stolen, she stopped for defendant at Canche's direction, although she did not want to do so since defendant had lost the respect of the Highland Park gang about two months earlier. Flores explained that defendant would have to earn back the gang's respect by committing crimes such as robbery, assault, or even a killing. She also knew that defendant needed money because he had been living on the streets. Canche had told her that he would do anything for money, which Flores expected from any gang member, as they would steal for drugs, money, or for retribution.

Flores was with Canche and defendant nearly all of the night before the murder. While driving around the group stopped briefly at Ocegueda's house to ask about Julio, who had been beaten in a robbery at his house, and then did other things. In the morning, Flores drove Canche and defendant back to Ocegueda's house where she parked in the alley near Ocegueda's room. While Canche went inside to speak to Ocegueda, she remained outside. Flores testified that as far as she knew defendant continued to sleep in the back seat of the car.

After about 15 minutes Canche and defendant appeared in the alley near her car telling her to hurry, "We have to go." Flores saw blood on their jackets and hands, and defendant was holding a large knife about five inches long with a mother-of-pearl handle, which he placed in the pocket of the passenger door. The two men were nervous, acting paranoid and overly rushed.

Flores testified she drove to Canche's house, where she attempted to escape, but Canche caught her, dragged her back to the car, placed her in the back seat, and drove to the home of a

4

man Flores did not know.[3]  Canche gave the man the bloody jackets and defendant told him to burn them.  The man put the jackets in a black trash bag and went toward the backyard. Canche held Flores by the hand or wrist while she was in the house.  For several hours afterward she remained locked in the car with the alarm set while Canche and defendant stood at a distance talking.  At some point Canche and defendant both cried, and Canche told Flores he was sorry.  Defendant and Canche would not let her leave the car.  Flores fell asleep until she was awakened by police officers who arrested her, searched the car, and seized a rifle from the center console.  Canche, too, was arrested, but defendant was not found.

In an interview with a Los Angeles police detective Flores at first lied, not wanting to be a "snitch" and wanting to protect her boyfriend.  She ultimately told the detective that Canche went into Ocegueda's house to get his own belongings, but she knew that defendant went inside to take Ocegueda's new laptop computer.  At Flores's direction the detective went to Osorio's house where Osorio said that defendant had asked him to burn the black bag, but he had left it in the trash where it was retrieved with an Adidas jacket that Flores identified as the one defendant had been wearing.  Another jacket was found in the clothes dryer.  Samples from both jackets tested positive for blood and Ocegueda's DNA.  Defendant's DNA was found on the Adidas jacket.  Law enforcement unsuccessfully searched for defendant for several years in Southern California.  In February 2010, defendant was arrested after breaking a car window.  Though

---

[3]     The man was Arthur Osorio, defendant's cousin.

defendant gave a false name and date of birth he was identified by his fingerprints.

Canche testified on defendant's behalf, taking all the blame for Ocegueda's death while denying he had ever intended to steal from or rob the victim.[4] At first Canche claimed he could not recall whether defendant was present. But later in his testimony he said he was alone with Ocegueda. Canche testified he was on friendly terms with Ocegueda in 2006 and he and Flores went to Ocegueda's home often. Canche claimed that he had never gone into the front house before because Ocegueda's parents did not want him or any of his friends there. Defendant and Canche knew each other from the Highland Park neighborhood where Canche grew up and they had been friends for several years.

Canche had limited memory of the evening before the murder. He recalled going to Ocegueda's house in the morning, where Flores parked in the alley and defendant slept in the back seat. Ocegueda was with his mother and sister and told Canche that he would meet him in the back after they left. Canche denied seeing defendant or any other man in the alley at that time. He claimed that after the mother and sister left, he followed Ocegueda to the front house when Ocegueda refused to help him gather his belongings in the garage room. Once in the front house Canche confronted Ocegueda with rumors that he had raped someone. Ocegueda became hysterical and they argued. Ocegueda repeatedly said Canche's name and pleaded with him not to do anything to him, which Canche found confusing because he was not being aggressive or threatening

---

[4]    Canche was in prison following his plea to voluntary manslaughter for his part in Ocegueda's killing.

and did not have a weapon. The argument became more heated until they exchanged blows and Canche took out his knife and stabbed Ocegueda. Canche described the knife as all silver or chrome in color.

Canche remembered returning to the car but not whether defendant was in or outside the car at the time. Canche did not recall going to Osorio's house, spending several hours there, or leaving his jacket there. Canche claimed Flores was upset at first and denied that he held her against her will. He recalled spending the night at a friend's home, but could not remember where defendant went. Canche admitted being a member of the Highland Park gang but refused to say whether defendant was a member of the gang. Canche admitted knowing that Ocegueda had computers and a laptop and conceded that Ocegueda might have had drugs during their visits.

In an interview after his arrest, Canche denied stabbing Ocegueda, participating in his murder, or knowing who did, adding, "and I'm not going to name no names." He told the detective there was someone else with him but claimed not to know who it was. When told he must know because he was there, Canche answered, "But I'm not going to tell you who did it."

Defendant's wife testified she had lived with defendant since 2004, married in 2009, and had never lived apart since their marriage, except for a few days in December 2006 after an argument. She said that defendant had worked the entire time and she produced several pay stubs. She did not know that defendant was a gang member, and knew nothing of this incident until his arrest in February 2010.

In July 2019 defendant filed a petition for resentencing pursuant to section 1170.95. The trial court appointed counsel

for defendant and scheduled the prosecutor's response.  On January 29, 2021, after briefing and arguments from both parties, the court found that defendant had failed to make a prima facie showing of eligibility under the statute and summarily denied the petition without issuing an order to show cause.  Defendant filed a timely notice of appeal from the order.

## DISCUSSION

Defendant contends that the trial court erred in denying his section 1170.95 petition without issuing an order to show cause.  Respondent agrees.

Section 1170.95 provides a procedure for convicted murderers to retroactively seek relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019.  (*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*); see § 1170.95, subd. (c).)  Under the amended statutes, an aider and abettor may not be convicted of felony murder or murder under the natural and probable consequences doctrine if he was "'not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Stats. 2018, ch. 1015, § 1, subd. (f).)"  (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)  A person is entitled to relief under section 1170.95 if, as relevant here, (1) "[a] complaint, information, or indictment was filed against [him] that allowed the prosecution to proceed under a theory of felony murder . . . ," (2) he "was convicted of murder, attempted murder, or manslaughter following a trial," and (3) he "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subd. (a).)

8

As defendant's petition alleged all three conditions and requested appointment of counsel the trial court properly appointed counsel, received briefing and then held a hearing to consider whether defendant had made a prima facie showing of eligibility under the statute.  (See *Lewis, supra*, 11 Cal.5th at pp. 957, 962; see also § 1170.95, subd. (c).)  The trial court was entitled to consider the record of conviction in making that determination.  (*Lewis, supra*, at p. 971.)  However, "[i]n reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'"  (*Id*. at p. 972, quoting *People v. Drayton* (2020) 47 Cal.App.5th 965, 980.)  "[T]he 'prima facie bar was intentionally and correctly set very low.'"  (*Lewis*, at p. 972.)

"[W]hen assessing the prima facie showing, the trial court should assume all facts stated in the section 1170.95 petition are true.  [Citation.]  The trial court should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law—for example, a petitioner's assertion that a particular conviction is eligible for relief where the crime is not listed in subdivision (a) of section 1170.95 as eligible for resentencing.  Just as in habeas corpus, if the record 'contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner.'  [Citation.]  However, this authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subd[ivision] (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion

(such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime).  [¶]  If, accepting the facts asserted in the petition as true, the petitioner would be entitled to relief because he or she has met the requirements of section 1170.95(a), then the trial court should issue an order to show cause." (*People v. Drayton, supra*, 47 Cal.App.5th at pp. 980-981; accord, *People v. Aleo* (2021) 64 Cal.App.5th 865, 871-872; *People v. Duchine* (2021) 60 Cal.App.5th 798, 811-812.)

Here, the trial court considered the appellate opinion and the preliminary hearing transcript but did not do so to determine whether there were facts showing that defendant was ineligible as a matter of law.  Rather, the court considered whether defendant "would or could be convicted of murder under the amended statute."  We agree with defendant and respondent that the trial court asked and answered the wrong question.  The question to be resolved at the prima facie stage is not whether there is evidence in the record of conviction supporting a finding that defendant would or could be convicted of murder under the amended law, but rather, did "'the record of conviction show[] the petitioner is ineligible for relief as a matter of law.'" (*Lewis, supra*, 11 Cal.5th at pp. 966-967 [rejecting a two-step prima facie process].)  The record of conviction showed that felony murder was a theory of defendant's prosecution, with no indication that the jury rejected that theory, and there was no jury finding that defendant was the actual killer, harbored an intent to kill, or was a major participant who acted with reckless indifference to human life.  Thus, the record of conviction did not refute the truth of the allegations of defendant's petition.  The trial court

10

was thus required to issue an order to show cause. (See *id.* at p. 971, citing *People v. Drayton, supra*, 47 Cal.App.5th at p. 978.)

We agree also with the parties that the trial court erroneously engaged in factfinding. Applying the factors suggested in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, the court extensively analyzed the facts presented in the documents it reviewed, drew inferences, weighed witnesses' credibility, and independently concluded that defendant was a major participant who acted with reckless indifference to human life. This is the sort of analysis left to the evidentiary hearing held pursuant to section 1170.95, subdivision (d), after an order to show cause has been issued and when the prosecution will have the burden to prove beyond a reasonable doubt that defendant is guilty of murder under a still valid theory of murder. (See *People v. Duchine, supra*, 60 Cal.App.5th at pp. 815-816; *People v. Drayton, supra*, 47 Cal.App.5th at p. 982.) We thus concur in the parties' request that the order denying the petition be reversed and the matter remanded for that purpose.

## DISPOSITION

The order denying the section 1170.95 petition is reversed and the matter is remanded for the issuance of an order to show cause and an evidentiary hearing pursuant to section 1170.95, subdivision (d).

_____
CHAVEZ, J.

We concur:

_____      _____
LUI, P. J.                  ASHMANN-GERST, J.

11